## KRAFT CHEESE CO. v. PABST CORPORATION.

(District Court, E. D. Wisconsin. February 23, 1927.)

1. Patents ⬤⟿136—Remedy of reissue is open to patentee in good faith, though mistakenly, claiming more than he really discovered.

Remedy of reissue is open to patentee, if he in fact, though mistakenly, claimed more than he discovered, or if he intended to set forth real discovery, but did so in language equivocal, self-repugnant, or otherwise open to charge that he could not, or did not, discover thing as broad as language susceptibly warranted.

2. Patents ⬤⟿328—Reissue 14,777, for improved process of sterilizing cheese, 1,323,869, for improved process for treating cheese, and 1,-400,171, for process for preparing cheese, held valid and infringed.

Kraft reissue patent No. 14,777, for an improved process of sterilizing cheese, patent No. 1,323,869, for an improved process for treating cheese, and patent No. 1,400,171, for a process for preparing cheese, held valid and infringed.

In Equity. Patent infringement suit by the Kraft Cheese Company against the Pabst Corporation. Decree for plaintiff.

Fisher, Towle, Clapp & Soans, of Chicago, Ill., and Miller, Mack & Fairchild, of Milwaukee, Wis., for plaintiff.

Lines, Spooner & Quarles, of Milwaukee, Wis., for defendant.

GEIGER, District Judge. This case arises on three patents issued to Kraft, plaintiff's assignor, and the defendant is charged with infringement.

The first patent, reissue 14,777, December 23, 1919, superseded an original, No. 1,186,-524 issued June 6, 1916, upon an application filed March 25, 1916, and it relates to "an improved process of sterilizing cheese to render it permanently keeping and to the product thereby produced," and the chief object of the invention is: " * * * To convert cheese of the Cheddar genus into such condition that it may be kept indefinitely without spoiling, under conditions which would ordinarily cause it to spoil, and to accomplish this result without substantially impairing the taste of the cheese. Incidentally the process has a marked value in that it has the effect of permanently arresting the curing or flavor development of the cheese, from which it follows that it may be brought to the precise stage of ripening desired, and then permanently arrested and kept in that stage or condition until consumed."

After noting as "common knowledge" that various food products may be sterilized

hermetically sealed, and rendered "permanently keeping," but that the attempts so to treat cheese of the "Cheddar genus" have invariably failed, in "rendering the product permanently keeping," the patentee continues:

"It is a well-known fact that cheese of the Cheddar genus cannot be heated to a temperature much above the melting point without disintegrating and permanently losing its true cheesy character; that is to say, the melted cheese becomes stringy, and the casein and fat separate, and cannot be returned to their original combined true cheese form and homogeneous condition. For this reason it has been impossible to treat such cheese to a high sterilizing temperature without spoiling it, and a completely sterilized—*that is to say, a permanently keeping—cheese* of the Cheddar genus has not been produced prior to my discovery." (Italics supplied.)

The applicant in substance recognizes that "soft cheeses"—naming some of them—have been made "permanently keeping" by sterilizing with heat, and then hermetically sealing. He gives as an explanation the effect of high and low temperatures on different classes of bacteria, and proceeds:

"On the other hand, in case of cheese of the Cheddar genus, the making and curing or ripening does not eliminate bacteria present, and which require a relatively high temperature to kill them, and it follows that the high temperature for sterilizing is imperative, and, coupled with such high temperature treatment, some treatment which will prevent the high temperature from disintegrating the cheese."

He has "discovered," so he continues, that cheese of the Cheddar genus "may be prevented from disintegrating under the action of heat of as high a temperature as 175° F., or even more, by subjecting the mass to proper agitation and stirring continuously, or substantially continuously, throughout the period beginning with the application of heat to the cheese and continued until it has reached the necessary temperature and been maintained long enough to insure thorough sterilization. A temperature of 175° F. maintained for a period of 10 or 15 minutes is ample to insure thorough sterilization."

His process involves in substance the successive steps of taking the cheeses in the conventional Cheddar form, cutting them into small pieces, to enable quick and approximately uniform penetration of heat; placing the cut-up cheese into steam or hot-water jacketed kettles, or other suitable heating devices, in which scorching may be obviated;

the equipment of the heating utensil with mechanical stirrers; the gradual application of heat until the content approximates 175° F., and the maintenance at that point to "effect complete sterilization, * * *" the period necessary for that being "usually * * * approximately 15 minutes"; actively stirring or agitating the cheese during melting and while at "sterilizing" temperature—thus insuring a product homogeneous then and after cooling and retaining its "true cheese character"; running the liquid cheese into suitable containers, ordinarily "sealed under sterile conditions"; cans and jars are suggested as suitable containers, and the sealing used in the act of canning and packaging fluids is adverted to as the course intended to be followed:

Upon the disclosure, of the claims allowed and now in issue, these may be noted:

"(1) The improved process of rendering cheese of the Cheddar group permanently keeping, which consists in heating and melting cheese, actively stirring it while melted and while thus maintained in homogeneous condition, raising its temperature to such degree as to effect complete sterilization and then inclosing it in protective containers under sterilized condition."

"(3) As a new article of manufacture, completely sterilized cheese of the Cheddar genus."

"(7) As a new article of manufacture, cheese of the Cheddar genus, homogeneous and so sterilized as to be permanently keeping.

"(8) The improved process of rendering cheese of the Cheddar group permanently keeping, which consists in heating the cheese, meanwhile actively stirring it to maintain its homogeneous condition, raising its temperature to such a degree as to effect sterilization throughout and then enclosing it in protective containers."

"(11) As a new article of manufacture, cheese of the Cheddar genus homogeneous in texture, sterile, and permanently fixed against further ripening.

"(12) The improved process of rendering cheese of the Cheddar group ripened to the desired flavor permanently keeping which consists after the cheese has been ripened to the desired stage, in heating the cheese meanwhile actively stirring it to maintain it in homogeneous condition, and raising its temperature to such a degree as to effect sterilization throughout and arrest further ripening."

"(14) The improved process of rendering cheese of the Cheddar genus permanently keeping which consists in comminuting the cheese, heating the same to effect sterilization and actively stirring the material during the time of heating thereby producing a homogeneous mass and maintaining the cheese texture."

In view of contentions, not only upon the foregoing patent and claims, but also in the other patents relied upon by plaintiff, it is advisable here to note that this reissue patent superseded an original containing five claims, including Nos. 1 and 3 above, and it also contained No. 2 (also in the reissue) viz.:

"The improved process of rendering cheese of the Cheddar genus permanently keeping which consists in heating it to *approximately 175° F.*, retaining it at such raised temperature for a *substantial period,* agitating or stirring the cheese during the treatment with heat, and finally placing it *while sterile* in suitable *sterilized hermetically sealed containers.*" (Italics supplied.)

And the reissue incorporated the last foregoing, also the following (claim 10):

"The improved process of rendering cheese of the Cheddar group permanently keeping, which consists in heating the cheese to *approximately 175° F.*, maintaining at least said temperature for not less than ten minutes, whereby *sterilization* is effected, actively stirring the cheese during said heat treatment to prevent disintegration, and inclosing said cheese in a protective container." (Italics supplied.)

If, approaching contentions respecting the "reissuable" character of the first patent in suit, that is, contentions such as frequently made because of the alleged lack of statutory bases, because of "broadening" or the like, we take the original patent and subject it to the query whether on its face, on the record before us, upon concessions practically made in the defense herein, it exhibits patentably novel subject-matter, an affirmative answer must be given. The history of the art of making, the stupendous manufacture, commerce, and consumption of cheese of the Cheddar type—we know it as "American" cheese, perhaps, better than anything else—accentuates the importance of these cases, resting, as they do, upon patents which deal fundamentally with taking what for ages has been considered the "finished product" as a base for a new process to make a "new" product.

Whatever may be urged respecting known processes or known steps taken in manufacturing cheese of the Cheddar type or types, neither the art nor anything produced in this

case negatives, or even tends to negative, the thought expressed in this original as Kraft's novel discovery, viz.: "To treat such cheese [Cheddar] to a high sterilizing temperature without spoiling it"—adding, as he does in his reissue, "that is, a permanently keeping cheese of the Cheddar genus." His specifications obviously indicate general knowledge of the uses of high temperature in effecting sterilization; that is, in destroying microorganisms. And he further charges himself with knowledge of the effect of temperature of *almost any degree* upon cheese—and assumes, as he properly may—that a temperature of 175° is a *high* temperature, which, if applied to cheese, is expected to produce structural changes, a destruction of texture, and real disintegration of structural elements.

Looking at the matter in this close compass, he might equally well have assumed that 125° or 150° Farenheit were "high" temperatures in this "effect" upon cheese, so far as concerns texture and capability of retaining structural consistency or the like. These considerations impress me as of much importance, because no one has suggested that prior to the time of Kraft's first endeavors, approximately 1911 or 1912, his "process" broadly considered as the *one* now recognized—was in any sense known or practiced. Upon dealing with the reissue patent, let it be conceded that language used in the original, when standing alone, not referable to the *desirable* objective, might prove academically or lexiconically embarrassing. I am confident that good sense alone is sufficient to deter such a treatment of either specifications or claims. It would hardly be fair to conclude that, recognizing the capability of the "high"—i. e., boiling—temperature, 212° F., as adequate to "sterilize," in the sense of destroying both existing microorganisms and all possibility of any further development, Kraft intended to assert as a discovery that, with respect to cheese, 175° F. produced *that kind* of "sterilization."

It may be suggested, either that he did not so profess, perhaps did not or could not have known, and that perhaps it is not and cannot be known to-day. But the sufficient reason for not ascribing to him an insistence upon *that sort of sterilization* is that his asserted purpose—even in the first patent (claim 1) *of rendering cheese of the Cheddar genus "permanently keeping"*—did and does not require it. Whether in words it is stated as "sterilizing cheese to make it *permanently keeping*," or to assert that it is "permanently keeping because it has been *steri-*

*lized,"* makes no difference when once the word "sterilize" is given a hard and fast definition, comprehending totality of microorganic destruction such as may be assumed to result ordinarily from the high "sterilizing" temperature recognized as 212° F. But if, upon the mere use of these adjectives, it be assumed that there are two classes of organisms, one, which a temperature of 140° F. would destroy, but the other required 212°, and it was desired to rid a product of the former, no one would misunderstand a claim that 150° "sterilized" the product, *as to the former organisms.*

So, upon the use of terms like "sterilization" or "permanently keeping," as a step in a process or as objectives in a product, it seems impossible to limit them solely to the utmost extremity that may be comprehended in mere academic or lexiconic definitions. No one should assume that more or less was intended than would be understood, and was *in fact required,* to make what is a distinct and novel advance in the light of the art of making and marketing. No one should assume that the objective—a "permanently keeping cheese"—meant a cheese never to be used, but made to be marketed solely to take its place as a prospective "antique." The sense is that which is ascribed in a truly comparative way—in all endeavors to can, preserve, or package other products—*permanent* for a period far beyond that possible in the native state of the product, but, always in the light of the probabilities in the course of commerce, in demand and consumption. Canned vegetables or fruits, no matter how "permanently keeping" they may be asserted to be, do not, broadly speaking, improve with age, but, on the contrary, get "old" from one season to the next, and commercially, at least, are rather quickly displaced, and quite regardless of their being "sterile" in any particular, or in a refined scientific sense.

And this is not at all countervailed by the patentee's initial statement of his "chief" object—"to convert cheese of the Cheddar genus into such condition that it may be kept *indefinitely* without spoiling, under conditions which would ordinarily cause it to spoil," for here again neither the art nor anything else requires "indefinitely" to be construed to accord with the most extravagant possibilities which the patentee may, but is not shown to, have had in mind. If these views aid in interpreting the patentee's representations and claims, we may proceed upon either original or reissue patent to inquire: "What did [Kraft] discover? And

what did he, in terms, claim by his patent?" Tilghman v. Proctor, 102 U. S. p. 721, 26 L. Ed. 279.

In answering, it may be conceded, notwithstanding what is last above noted, that Kraft's language—in both original and reissue patents—discloses the notion of *"complete sterilization"*; for he uses that language, and the thought also appears in his discussion of the possibility, and, as he assumes, the practice, of sterilizing "soft" cheeses without "high" temperatures. His ventured explanation thereof, viz. that in such soft cheeses certain of the bacteria are killed by "low" temperature, and the rest, which *can* be killed only by "high temperature either commit suicide or are poisoned, need not be accepted as certainly true. But it is important in its indication of his purpose to deal with *temperature,* once it is raised "much above its melting point," in its effectiveness to "disintegrate" "Cheddar" cheese and make it lose "its true cheesy character." That is the fact—of common knowledge, so he says—with which he starts, and with reference to which endeavors for "sterilizing" or processing Cheddar cheese to a "permanently keeping" quality, or for arresting "further ripening," are intended to be ordered. The identical language of these two patents, as I conceive, of itself negatives the thought, pressed by the defendant here, that Kraft was seeking to limit himself to exactness either of temperatures, time, or *degrees* of other steps to be taken in a process. His discovery is:

(1) In the susceptibility of Cheddar cheese to retain its structure ("may be prevented from disintegrating") under the action of heat of *as* high temperature *as* 175° or *even* more, *by*

(2) Subjecting the mass (becoming and being "melted," and therefore in danger of disintegrating) to proper and continuous stirring, agitation, etc., until it has reached and maintained the *necessary* temperature, the latter to be maintained long enough to "insure thorough sterilization."

(3) That 175° F., maintained for "ten or fifteen minutes, is ample to insure thorough sterilization."

I do not interpret the statement of his discovery as containing, expressly or by conclusive implication, a "specification" of 175° F. as *the* and *only* degree of temperature *necessary* (1) to prevent disintegration; and (2) to insure "thorough" sterilization. To say that cheese, actively stirred, "will not disintegrate on a temperature *as high* as 175° F.," may clearly assert *that* temperature to

be "high"—probably *much* above the "melting" point—but it does not negative the fact that 150° F., 160° F., likewise may be "high," and "much" above such melting point; nor does the assertion that 175° F. has been found, if maintained for 10 or 15 minutes, "ample," negative the adequacy of 150° F. or 160° F. to insure—not the *same* sterilization as 212° F. and above, suggests, but such "thorough" sterilization as has for its objective the arresting of further ripening, and bringing it to the "condition that it may be kept indefinitely without spoiling, under conditions which ordinarily would cause it to spoil;" or, again stating it as in claim 1, "rendering [it] permanently keeping," in a sense demanded in the art and industry. It is of some importance in considering the question of reissue that, if "sterilization," or "complete" or "thorough" sterilization, could not be considered or used by the applicant in a relative sense, then "ample" must be denied its common meaning of "abundance" or "liberality," but must be defined as "indispensable" or "exclusive."

These views are believed to pertinently support the proposition that, upon the face of both the original and reissue patents Kraft's discovery disclosed steps, factors, or elements, such as temperature and time, respecting neither of which did he attempt to fix either at one or another point, to the exclusion of what might be called a range, beyond or below. Therefore, without even resorting to the so-called doctrine of equivalency, the patents disclose a claim of discovery of a *range* of degrees of temperature, or of time, within which the step or steps may be taken; that the designation of one degree of temperature, or one or two periods of time, as "ample," did not and does not exclude such range, higher or lower, of either factor as in truth might still adequately suffice for the practice of the processes. And this is true, quite regardless of whether the patentee knew or appreciated it, if the subject-matter toward or upon which his endeavors were exerted, and the state of the art at the time of his alleged discovery, permitted a claim of that breadth.

Such was the view taken in Tilghman v. Proctor, where, as here, a particular temperature was disclosed, but a claim in general terms was allowed. And here, as there, the query in substance may be raised, why, if 150° to 160° is adequate, should the patentee be limited to 175°? Can it be said that the patent on its face, when the state of the art and his real objective are considered, must impute to him, not mere ignorance of the range,

but a denial of the existence of any range of temperature? I do not understand that such is the principle governing the interpretation of patents of this character; on the contrary, if the claimed discovery is such that, in the absence of anything in the art or the patentee's professions which forbids recognition of such a range, such range, whether its precise limits be known, or knowable, or not, must be recognized as a part of the discovery.

Now Tilghman v. Proctor, as exhibiting that principle, finds support in what is either a reverse principle, or the application of the same principle to a reverse state of facts, in Minerals Separation v. Butte, etc., Mining Co., 250 U. S. at page 340, 39 S. Ct. 497, 63 L. Ed. 1019. There the question of discovery or invention turned upon percentages of a product—oil—to be used in a treatment or process of ores; and the court limited the patentee to a fixed percentage, because in his patent, as well as in his case in court, he had unequivocally asserted non-invention—no possibility of invention—within a range above a point fixed by him. The court held that the percentage had been fixed and was insisted upon by him as "marking the *point of transition* from the processes of the prior art to the process and discovery of the patent." So, if here, Kraft had named degrees of temperature or periods of time with an insistence that his discovery marked those so fixed as transition points from other processes, he should of course he held to his exact claims. If to claim the one he denies the other, he disclaims the latter as a part of his "discovery," and cannot thereafter claim it *as a part of his discovery*.

This discussion leads, as it was intended it might, to the broad view that there may have been no need of a reissue of the original patent. But this is true: That if, upon the consideration of such original patent, it could be drawn into the field of debate respecting the magnitude of his claim for *"complete* sterilization," it would seem that the patentee, in representing that he did not intend in fact to make so broad a claim, because he did not and perhaps does not know whether it is tenable; that he desired merely to make the claim of discovery of a process for a "permanently keeping cheese" (it might be far short of complete sterilization in a scientific sense); that he desired to introduce such view as his definition—then, on elementary grounds, he was in the field of propriety, and therefore, of right, regardless of *necessity,* for reissue.

[1] The remedy of reissue is open to him if he in fact, in good faith, though mistakenly, claimed more than he really discovered, or if he intended to set forth the real discovery, but did so in language equivocal, self-repugnant, or otherwise open to the charge that he could not, or did not, discover a thing as broad as the language *susceptibly* warrants. The remedy should be as open to eliminate doubt or debate entertainable upon language used as to eliminate clearly erroneous or excessive subject-matter. If this course is not open to a patentee, the embarrassment arising would be strikingly illustrated in the present case. For obviously the contentions now made by the defendant against the validity of the reissue might in substance be urged against the validity of the original patent; that is to say, if the designation of 175° F. bound the plaintiff in the reissue because, so it is urged, it bound him in the original, then the latter might be claimed to be wholly invalid, because it asserted—contrary to the probable, if not conceded, fact—that that temperature in no event produced "complete" sterilization, i. e., the total destruction of micro-organisms; that therefore, having claimed something which he did not invent (perchance, *not inventible*), he could not enforce the claim for what would be recognized as a "practical" or "substantial" sterilization.

It may be but a restatement of the matter to say that though, in the absence of reissue, the court, on considering the first patent, might interpret it to mean "permanently keeping," instead of "completely" sterilized, still the reissue statute intends to *allow* the patentee opportunity to avoid the necessity of such an issue, if he can assure the government of his real meaning and intent. If such course is not open, then, in the case before us, claims 1 and 2 of the original, and the corresponding claims of the reissue, must all bow, not only to the specification of 175°, but also to a concededly repugnant element of "complete sterilization." It is conceivable that, if the defendant in fact practiced a process wherein it used a *much* higher temperature than 175°, and thereby professed to accomplish scientifically "complete" sterilization; if it then and thereby sought to maintain the proposition of differentiating both in *process* and in *product* from Kraft, it would present a distinctive ground of defense; whereas, in the case here, if it be conceded that Kraft's formula for using 175° is a meritorious discovery of a process for a product sterilized in the sense of "permanently keeping," then both plaintiff and defendant, upon the proofs here, must concede

that their commercial processes and products vary, if at all, *in degree* only from that taught, even in the original patent.

Plainly, upon the record before us, if the plaintiff followed the original or the reissue specifications with respect to 175° F. as rigidly as defendant insists it must, the defendant, if it followed claim 1 or 2 of the original patent, save in using 150° or 160° F., could not claim that it was following a process varying other than in the *degree* of the temperature step, or that its product differs other than possibly in the *degree* of its "permanently keeping" or "sterilized" attributes, from the process or product of Kraft. And upon that hypothesis the defendant here does not claim that it is *not* making what may be called a "permanently keeping" cheese, or one *not* having the attributes of a processed Cheddar cheese claimed by Kraft in his first patent. As between the parties, it is not even suggested that, if Kraft's disclosure of process and product is really new, the defendant is also upon new ground, but in a really different sense. And, respecting defendant's infringement of such alleged novel disclosure, the scope of inquiry may include (1) that plaintiff and defendant are upon identical old, or (2) that defendant is upon new, ground, or at least in a field not comprehended within any possible interpretation of Kraft's claims; or (3) that it infringes.

When, therefore, we are brought to the proofs in this case, there are some general considerations impressively supporting the broad proposition that while, in the cheese-making art, products and processes of great variation are found, neither of the parties here, nor any one else, did what is now well developed, prior to about 15 years ago, when Kraft began the endeavors which resulted in the patents in suit. The record shows without controversy the general processes of making Cheddar cheese, its curing, keeping, both prior to and after marketing, and prior to consumption. And therein, in my judgment, is found the basis for the broad proposition that the field of endeavor was large, and, when account is taken of the recognition accorded to process and product, the patent embodies new and useful subject-matter. No doubt, so those proofs likewise establish, not all that Kraft uses in his processes was new in the cheese art. The use of heat, the agitation of a mass of heated raw material, the making of certain tests to determine consistency or the proper stage of a step, were recognized in the art. The taking of one kind of cheese, cooking it, to make "cooked" cheese, is amply proven.

It may be that "sterilization" of some kind had been practiced. Kraft seemed to think so. But, as first hereinbefore observed, the treatment, or retreatment, of Cheddar cheese with heat of "high" degree relatively to the melting point, in such a way as will retain original consistency, texture, flavor, and the like, was, and I think is, new. And as between Kraft and others such as Carpenter and Eldredge a controversy respecting priority most persuasively supports the view that the *thing was a discovery.* The defendant cannot escape *that* when relying or attempting to rely upon one side of that controversy to defeat validity of the patents in suit. A voluminous interference record, abounding in proofs of novelty of the process and product, may be tendered here to support a contention that plaintiff's assignor was not *first,* but, when here, may go a long way to defeat defendant upon its contention that *no one discovered* the process or product—that it has always been known.

With respect to the proofs, so far as they are found in these voluminous Patent Office records, and offered because of their pertinency upon the issue of priority between Kraft and Carpenter and Eldredge, this may be observed: That the parties—Kraft's patent having been issued—seem to have produced every available bit of evidence pertinently bearing upon conception, experiments, reduction to practice, and the like. Not only did the respective interference parties so exert themselves, but the examiners, in considering and determining the issue, seem to have marshaled the evidentiary facts supporting either side of the contentions, and filed an opinion exhibiting a most critical and exhaustive treatment of every matter of fact. Therefore, priority being awarded to Kraft by the executive tribunal which had the issue before it, the court may at once pay great respect to such determination, even though the issue is here again tendered by an alleged infringer, who, however, sees fit to support it by the same testimony. ·

The Patent Office seemed impressed, not with the idea that the testimony was all on one side, but, on the contrary, with the presence of conflict between experimenters whose labors were shown to be in rather close concurrence. In such situation the court is not called upon critically to re-examine all of the testimony to discover a different standard for considering it, or any part thereof, to rebalance the credit to be given to witnesses or to other proofs, in order to try to find a different preponderance. The matter might be allowed to rest with this observa-

tion, were it not for the further contention, made by the defendant here, that its defense is really beyond any issue of the interference. It is now urged that, as its sole issue arose upon claim 3 of the original patent issued to Kraft, viz.: "As a new article of manufacture, completely sterilized cheese of the Cheddar genus" therefore the other claims now in issue in this case were not considered on the interference, and the defendant is privileged to urge their invalidity, whether they be in the original or the reissued patent.

Without attempting here to summarize the interference, or other Patent Office records, and which illustrate the scope of contention presented upon various applications —it appears the Patent Office was called upon to consider applications dealing with Camembert, Swiss, and Cheddar cheeses—it is significant that, even upon consideration of claim 3 of Kraft's original patent as embodying the issue on interference, i. e., "completely sterilized cheese of the Cheddar genus," the proofs, apparently from both sides, demanded consideration, not of a specific temperature, but of a considerable range. Thus, speaking of Kraft's endeavors in perfecting and reducing to practice, the opinion of the Patent Office:

"It is shown that, soon after this machine and the supplies arrived, a number of four-ounce tin cans were filled with Cheddar cheese, and, after being sealed by the new machine, were successfully sterilized in hot water at a temperature of from 160° to 175° F. for thirty minutes. * * * It is admitted that the product thus obtained was not all that could be desired, for it is subsequently stated that butter fat had collected in the cheese cavities, and that the cheese looked smeary when opened. There is, however, ample proof that the product as then produced was sterilized, and that it was made at the time stated."

It also appears that at that time it was contended that Kraft's article was "not completely sterilized." The, importance of this arises out of the fact that at that time Carpenter & Eldredge apparently made no insistence as against Kraft, except in respect of claim 3. At that time they had an application containing, as will later appear, one claim which was an exact copy of Kraft's claim No. 1 of his original patent—identical claim 1 of the reissue. But as against Carpenter & Eldredge, and for that matter against the present defendant, who relies upon their contentions and their proofs and records in the Patent Office, strong support

for Kraft is found in the record which is before the court as Defendant's Exhibit 13, Carpenter & Eldredge "abandoned application." Such record discloses an attempt on their part to draw into interference claim 1 of Kraft's original patent, and to obtain allowance of certain of their own claims, strikingly similar, not only to Kraft's claim No. 1, but claim 2; the latter dealing with a specified temperature, 175° F.

The argument in this record, when considered in connection with the other interference above referred to, seems to leave not a shadow of doubt upon the proposition that Kraft's processes, as well as his product, was conceived to be entirely new; that all who were interested in the art, and who participated in these proceedings, assumed that "sterilization" *of some sort,* and that retention of texture and flavor—of Cheddar cheese —was brought about by the processes of heating *somewhat* above the melting point and actively stirring. The contestants and the Patent Office tribunals regarded the latter as an indispensable necessity, and, as the record showed, it was stressed throughout all of the proceedings.

The Primary Examiner, in disallowing Carpenter & Eldredge's claims, which were asserted as open to allowance, notwithstanding Kraft, as a part of the prior art, in view of the other interference, was called upon to deal with claims, viz.:

"7. The method herein described of treating cheese of the Cheddar genus, which consists in raising its temperature to 165° Farenheit, thus causing it to melt, maintaining the cheese at this temperature for 30 minutes, and stirring the melted cheese during this time.

"8. The method herein described of treating cheese of the Cheddar genus, which consists in comminuting the cheese, raising the temperature of the cheese above the melting point thereof, stirring the melted cheese for approximately 30 minutes and placing the cheese in unsealed containers."

Carpenter & Eldredge, to support the allowability of these claims, comment upon Kraft's specifications of 175° Farenheit and proceed:

"The obvious difference is that, as the temperature employed by applicants is 10 degrees lower than that used by Kraft, various volatile substances contained within the cheese mass and vaporizable at temperatures used by Kraft may not volatilize at temperatures used by applicants, so that the losses from vaporization are less in the process used by applicants than in the process of

Kraft. This means that the various aromatic and tasty oils are not removed as extensively in applicant's process as in Kraft's process, and that as a consequence the sterilized cheese of the applicants' has a richer taste.

"It might be asked why, if this statement be true, did not the applicants, in their application as originally filed, point out and lay stress upon the advantages of heating cheese for a long time at a low temperature. The answer is that, at the time the application was filed, the applicants had no occasion to contrast their *preferred* temperature and *preferred* time period with any other temperature or time period used by anybody else. What they did was the ideal thing to do, namely, they pointed out affirmatively what time and temperature they had found to be *effective*. They did in fact point out that they improved the flavor and appearance of the cheese and that they rendered its texture homogeneous and uniform as above discussed." (Italics supplied.)

Now, the Examiners in Chief, in rejecting the appealed claims, invoke the Kraft patent as prior art, but make the following response to the contentions above set forth:

"The patentee (Kraft) employs a somewhat higher temperature than appellants, and does not subject the cheese to the action of heat for so long a period. Thus appellants employ a temperature of 165° F. and heat and stir for 30 minutes; whereas, in the reference a temperature of 175° F. is employed and the heating and stirring is carried on for 10 or 15 minutes. We think it is obvious that, in a method or process like appellants', the lower the temperature employed, the longer the heating and stirring must be carried on. It seems to us a mere matter of choice or selection whether low temperature and relatively long heating and stirring be employed, or high temperature and heating and stirring for a relatively short period. Appellants urge that, by reason of the employment of low temperature and long heating and stirring, various volatile substances in the cheese are not driven off, as would be the case if higher temperatures were employed. But we think this would be obvious to the skilled worker in the art and necessarily inherent in the process which appellants have selected. No error is seen in the final rejection of the appealed claims."

It is interesting to note that in this connection Carpenter & Eldredge appealed for leave to recast claim 7 above quoted, thus:

"7. The method herein described of treating cheese of the Cheddar genus, which consists in raising the temperature to a point *not substantially* higher than 165° F., thus causing it to melt, maintaining the cheese at this temperature for a *period of time* sufficient to sterilize the cheese, and stirring the melted cheese during said period of time." (Italics supplied.)

And the Examiners in Chief, in denying leave to restate the claim, say: "Although we think the proposed claim is not obtainable over the disclosure of the Kraft reference, it may be admitted as a more accurate statement of appellants' invention than claim 7 on appeal."

Of course, the striking feature of the proposed amended claim is found in its language, "not substantially higher" and "a period of time sufficient to sterilize," for this at once raised the query whether there is any difference between not *"substantially higher than 165"* and *"approximately 175"*—Kraft's idea. It discloses that, notwithstanding an argument attempting to support 165° F. as embodying different "inventive thought," the applicant felt impelled to recognize *ranges* of temperatures and of time. The argument itself—dealing with *degrees* of volatilization or vaporization as affecting the *taste* of the product—was addressed, not to a process or product differing in *steps* or result in *kind*, but to variations of *degrees* to which the former may be pressed, with possibly a preferable, though the same *general,* result.

So, between Kraft and Carpenter & Eldredge, these various proceedings disclose:

(1) Express findings of fact in favor of the former, not only upon the priority of invention embodied in claim 3 of his original patent, but upon the implications therein in the light of proofs dealing with processes pursued.

(2) The failure on the part of Carpenter & Eldredge to claim their prior invention of the disclosure of claim 1 of Kraft's original patent, though opportunity therefor was present in the exact identity of claim 10 of *their* application, out of which the interference was declared.

(3) The decision adverse to Carpenter & Eldredge on the merit of their appeal for allowance of other claims, e. g., 7 and 8, of their application, and which presented almost the precise contentions that they might have made on claim 1 of Kraft's original *and reissue* patents, in so far as that claim embodies *ranges* of temperature, of time for heating and stirring—with "sterilization"— as an objective.

(4) An "abandonment" of the applica-

tion last above referred to, which—in the light of the issues tried and tendered, and of the circumstances later developing; that is, the agreement between Kraft and Carpenter & Eldredge's assignees—should now be held to be a complete *acquiescence* in the Patent Office determinations.

It may be that this does not foreclose the present defendant from attempting to relitigate what Carpenter & Eldredge presented in the Patent Office; but, as has been indicated, when it appears that the art was so thoroughly canvassed and critically considered, the executive action, not only with respect to "priority," but also with respect to the scope of Kraft's endeavors, is most persuasive here, where an alleged infringer relies so largely upon the records and proofs adduced in those controversies.

This discussion of the validity of the reissue, involving matters appearing on the face of both patents, also those found in these records of interference, has sought to comprehend considerations respecting the scope of the former, if held valid. And the general conclusions are reached: (1) That the reissue patent is valid, devoid of the infirmity charged; i. e., that it is broader than the disclosure of the original, or that the latter conclusively barred the applicant from remedying what might be construed as an excessive, or even doubtful, claim of invention—in other words, to remove doubt. (2) That the reissue, and the claims here declared upon, are valid, of broad scope, and as such entitled to liberal interpretation to protect the discovery of the process for making a Cheddar cheese "sterilized," as he defines it and as the art apparently clearly understands it.

Upon a consideration of the second and third patents in suit, if it devolved upon the court to segregate each and its specifications and claims from the first patent (now the reissue), so that it might appear where and when the latter, or any part of it, in all instances, is either included in, or excluded from, such second or third patents, the task probably could not be performed. But if either the first or the reissue patent, and its basic thought and discovery, be kept in mind and given the credit herein awarded respecting the treatment of Cheddar cheese and the resultant new product, there can be no difficulty in finding in these later patents such thought and discovery, as implications—as recognized basic art upon which further improvement and development is attempted. It will be seen, I believe, that there is no need of going to so narrow ground as "im-

plications," for, indeed, "assumptions" of that basic discovery are quite clearly expressed.

The second patent, No. 1,323,869, was issued to plaintiff's assignor, Kraft, December 2, 1919, and it relates "to an improved process for treating cheese, and refers more specifically to a process for remaking cheese, consisting wholly or chiefly of the Cheddar genus"—the latter including all, "however named, made by a Cheddar process." The "chief objects" are:

"To provide a process whereby cheese in weights which for any reason are not readily salable may be remade into salable cheese in such weights as are at the time in great demand; to provide a process by which cheese of sizes which are convenient and suitable for economical making, curing, and storing, but not readily marketable, may be rapidly, economically, and efficiently remade into cheese of sizes which will be most readily salable; to provide a process whereby lack of uniformity in composition, flavor, moisture, conditions of age, etc., is eliminated, and a blended product produced, which may readily be made to conform to the desired standards, etc.; and to provide a process for converting ordinary commercial cheese into cheese specially adapted to withstand comparatively high temperatures for extended periods without becoming spoiled."

The patentee refers to the common practice to put up Cheddar cheese in varieties dependent upon the amount of casein and butter fat, the great variety of sizes, shapes, qualities, degrees of curing, resulting in non-uniformity in the market, and his efforts are directed to standardization, uniforming, or blending these varying products; and further reference is made to the practice—justifiable, as he thinks, on the score of economically manufacturing, handling, and curing—of initially putting up cheese in "conparatively large sizes," 60 to 100 pounds. Against this it is pointed out that, on the demand for consumption, the large sizes are not in favor. He declares his process adaptable "to produce a cheese of any desired size and of any desired standardized richness," and cites, as an example, the remaking of Cheddar cheeses ordinarily obtainable on the market in types or styles such as Edam, Gouda, adding that their preparation and readiness for market requires "a few days" as against hitherto known methods requiring "one to four months," time for such preparation.

The practice of the process (as in the first patent) requires the cutting up of the

Cheddar cheese—which may be selected with a view of producing a blend or particular standard of uniformity—placing in a mixing vessel which is provided with a stirring device, whereupon "heat is applied, * * * to raise the temperature of the cheese gradually to what I term a 'critical' temperature and condition. * * * Meantime, while the heat is being applied, the mass of cheese is vigorously agitated or stirred, such stirring being desirably continued the entire period of heat treatment and necessarily during the latter stages of the treatment."

He continues: "As the temperature of the mass of cheese rises and approaches the critical condition, the cheese becomes of a taffy-like consistency, which is, perhaps, better described as being between the consistency of dough and rubber. The temperature of the cheese, when it has reached the desired consistency, will vary somewhat with different batches and varieties of cheese, and may be anywhere from 125° F. to 150° F.; but the 'critical condition' has arrived when the cheese may be drawn out into long attenuated strings without breaking. For a full cream cheese this temperature, according to my practice, will usually be slightly below 140° F.; somewhat higher temperature being required for a skim cheese or one containing less butter fat."

The conditioning of the mass to the "critical" point is explained: "Because, if the temperature be raised and the treatment continued after the cheese has attained the desired consistency, it becomes short, is changed from its true cheese character, and eventually takes on a creamy consistency, which results in a breaking of the original texture of the Cheddar style of cheese. On the other hand, if the treatment with heat and agitation be less than that required to bring the cheese to the 'critical condition,' the product will be a failure, both because it will not be fully blended and homogeneous throughout. The discovery that there exists a 'critical condition' of the treatment, and how to attain and determine that condition, constitutes an important and characteristic part of my invention."

The specifications suggest that, to promote uniformity of texture and greater ease of practice, the addition of water during treatment, also the introduction of "hydrogenated cocoanut oil," which, because of its higher melting point than butter fat, adds to the capacity to resist higher temperatures than the original cheese.

The patent directs the molding of the cheese into desired shapes or forms, it being understood "that, from the time the cheese goes into the molds, the subsequent steps correspond to the usual ones involved in the molding of ordinary Cheddar cheese."

Among the claims are:

(1) "The improvement in the art of remaking cheese chiefly or wholly of the Cheddar genus which consists in comminuting the original cheese, raising its temperature while actively stirring the comminuted material, arresting the application of heat when the mass becomes of a plastic, uniformly blended consistency, but still retains its cheese texture, and subsequently reforming the mass into suitable shapes of the desired size."

(2) "The improvement in the art of remaking cheese of the Cheddar genus which consists in comminuting the original cheese, raising its temperature while actively stirring the comminuted material, arresting the application of heat before the temperature of the cheese exceeds 140° F. to 150° F., depending upon the butter-fat content, but not until the mass becomes of a plastic, uniformly blended consistency, and subsequently reforming the mass into suitable shapes of the desired size."

Claim 5 is of similar import, save that it gives a range of temperature "between 125° F. and 145° F."

We come to the third patent in suit, No. 1,400,171, issued December 13, 1921, covering a "process for preparing cheese, and has particular reference to * * * preparing for sale in convenient units cheese of a normally solid variety as "American cheese," which has been manufactured according to 'the Cheddar or analogous process in the ordinary country cheese factory." It refers to the patent No. 1,323,869, last above considered, dealing with remaking such cheese into types similar to Edam and Gouda; that, although such method is feasible and successful, the demand is rather limited, when "compared with the demand for standard American cheese in other shapes." A prospective "extensive market for American cheese put up in relatively small units, if it were possible to manufacture such units successfully and of such form as to be convenient to handle by the retailer and consumer without waste," and that because of the shape of ordinary American cheese heretofore manufactured, the presence of the hard rind has led to wastage, etc., are referred to as suggesting the principal objects of the invention, viz.:

"To prepare cheese of the type described in units of such size and shape that can be readily sold to the smallest retailer without

cutting the cheese or breaking the package; to provide such cheese units so prepared and packaged that the retailer can cut off and sell to the consumer any desired weight or quality while at the same time drying out or spoiling the unsold cheese is practically eliminated; to provide cheese of the American variety which shall be free from objectionable rind or inedible skin; to provide cheese units which as such shall be practically odorless and also which will not absorb objectionable odors; to provide cheese units which may be stored for many weeks without substantial drying out or other deterioration or loss of texture or flavor; to provide a cheese package which shall be highly attractive * * * practical and convenient to handle, etc.; * * * to provide an improved process of producing and preparing such units. * * * *"

This, called the "boxing" or "packaging" patent, professes to follow the initial steps of the two previous patents with respect to comminuting Cheddar cheese, placing it in a mixing vessel provided with heating and stirring appliances, and thereupon (as directed in this third patent):

"After the heat has been applied for a certain length of time, for example, from 15 to 30 minutes, and the temperature has been raised from the ordinary room temperature to in the neighborhood of 130° F. to 150° F., the comminuted cheese mass has attained a plastic consistency somewhat like that of ordinary baker's dough, and in order to secure cheese of the finest flavor and texture the temperature should preferably be discontinued when this stage has been reached. If the heating continue further; for instance, to 160° or 180° F., the rubberlike or doughy consistency of the cheese disappears, the fluidity increases until a creamy consistency results, and the resulting product, although quite edible and palatable, does not possess the texture which is ordinarily associated with that type of cheese which is being treated."

The applicant further observes that, although greater ease of practice follows upon "carrying the heat a little further than indicated," yet "from the standpoint of flavor and texture I have found it desirable not to exceed a temperature of 150° F."

The succeeding steps of the process are: The making of boxes of containers of the kind and capacity, lining with tin foil, as described, putting the plastic mass of cheese therein, and placing the covering thereon. The detail, the asserted advantages to the cheese, and its marketing or so packaging, are given in the specifications, and need not be here repeated. Claim 1 reads:

"The improvement in preparing cheese of a normally solid variety, which consists in comminuting cheese which has previously been manufactured in a country factory, stirring and heating the same until the mass has attained a uniform plastic consistency and is capable of flowing to assume the shape of a container and inclosing definite portions of the fluid mass while still heated in substantially rigid containers lined with sheet material which will stick to the cheese rather than to the walls of the container and will contract with the cheese and which material is substantially impervious to moisture."

As was intimated before undertaking to abstract these patents, if the court were called upon to accept the thought that each of the three patents in suit, not only embodied a broad basic concept, but that, as such, it was unrelated, either in whole or in part, in specifications or in claims, to either of the others, and in particular to the first patent, it could not be done. From the standpoint of the plaintiff it suffices that it makes no contention that such thought must be accepted or enforced. And from the defendant comes the partial, but candid, concession that, if the first and second patents in suit be held valid, "nobody cares what happens to the third." Of course, once it is recognized that the patents have a relationship to each other, in the art, in an effort to *continue* the development of processes or products which are the subject of Kraft's original or reissue patents, then the problem of determining with precision in a single case what, if any, and, if so, to what extent, portions of the specifications, or of the claims or parts of claims, of the later, embody recognition and adoption of disclosures of the earlier, or parts thereof, may not be easy to solve. And yet it is possible as this case now stands to determine whether the three patents may be reconciled upon disclosure of novel additions in the later not found in the earlier, which were deemed entitled to recognition. And, if such reconcilement can be made, it follows that in a particular case, even if possible, it may not be needful to determine exactly *all* the points, of mere contact, or of overlapping, or of adoption, of or in, one as against another patent. And, even if it be conceded that Kraft's earliest and his reissue patents, in themselves or on comparison with these two later patents exhibit repugnancies (at least in language) on the matter of range of temperature or of conceptions of "sterilization," it does not at all follow that he must

be held to that end, or that angle of a repugnancy which will relieve one, who, if the other end or angle be adopted, will be an infringer. As has been indicated, the state of the art must dictate whether an invention be regarded as basic, and, if it be so regarded, then even a repugnancy of statement in specification or claim cannot be effective to destroy an invention otherwise clearly disclosed.

When, therefore, the reissue patent in suit and its original are considered as disclosing the basic discovery of a new process and product, when there is accorded breadth and liberality in definition of sterilization, and a range, rather than any specific temperatures, effective to, bring about such "sterilization," or "permanent keeping" qualities, of the product, then the court. may readily approach the second and third patents, to consider their validity as subordinate or "adjunctive," in the light of principles applied in North American Chemical Co. v. Dexter (D. C.) 252 F. 149. The defendant's broad contentions are directed to the reissue, and, as counsel expressed it, to any attempt on plaintiff's part to "get away" from the temperature and from the definitions of sterilization found in the original. So, when it appears, as I think it does, that plaintiff and defendant are making an identical product (i. e., a remade Cheddar cheese, processed at approximately 150° F., boxed and packaged identically), the defendant now argues:

(1) That the first or reissue patent in suit is void, because opening a range of temperature contrary to the specification of an absolute temperature of 175° of the first patent—and, as defendant uses 150°, not an equivalent—it does not infringe.

(2) That the second patent—though specifying a lower temperature than the original, viz., 140° F. to 150° F.—likewise specifies a process and a product for and of *types* or *shapes* like Edam and Gouda cheeses. The defendant, while using the temperature-thus specified, does not make the specified types or shapes; hence, does not infringe.

(3) That, although defendant follows the process respecting temperatures of the second patent, and identically the packaging steps, the latter are old, and since it does not infringe the second, as above noted, it does not infringe the third patent which professes merely to add the packaging step to the second.

Kraft appears to have had little difficulty in obtaining recognition upon his application for both second and third patents in suit.

And while this—the defendant so suggests—may be attributable to a composition of controversies between himself and others in the Patent Office (that, however, is not found to be the fact or a necessary inference), there is nothing in the record to overcome either their presumptive or actual merit, when once they are considered as in continuation of an art developed under the first patent. I am content to regard them, in their dealings with temperature, not as asserting entirely new discoveries unrelated to the original or reissue disclosures, but rather as reflecting the developed experience thereunder—as reducing, *within a range*, a preferable or normally adequate temperature for practicing the process which the parties here are agreed is most satisfactory—to produce their identical product. If we now go beyond this, to consider the other disclosures or claims of these two patents, of necessity, it must be recognized that Kraft's original disclosures brought to the art, not merely the new product, but possibilities in its commercial development and exploitation, not attempted to be comprehended in his earlier patent.

Initially he may have had it in mind to limit himself to "canning" or "tinning" his product, though, as a matter of impression, I doubt if his claims which deal with the "container" step of his process necessarily so limited him. But this seems to me quite probably true: That if, upon his first applications, he had disclosed the scope, the tests of proper heat treatment, the variations (he called it "versatility"), the amplifications or refinements of forming, or of packaging, set forth in his second and third patents in suit, appropriate "adjunctive" claims would have been allowed, for the purpose of giving adequate protection to the basic discovery. And this is believed to be entirely consistent with the concession that a step of making a cheese round or square, or of protecting it with foil, or putting it into a box, is not, standing alone, a basically new thought. But equally true is it that, if possible, when a new development in an art is disclosed, the court, in dealing with workers in that art, should perceive that which presumptively prompted, or would prompt, recognition by the executive. And in this particular case we may cite this: That the thought of "remaking" Cheddar cheese, handling a new product (which originally was believed to be capable of canning only) in a variety of more advantageous ways, as shown by the second and third patents, is not entirely devoid of novelty. This is particularly true when, as here, the proofs show a widespread recognition of the im-

proved steps in the art, and, specifically, by an alleged infringer.

If the second and third patents cannot be given effect, reasonably, as herein indicated, there are two, and only two, alternatives:

First, that each of the patents is wholly anticipated by Kraft's first patent, and, if so, the latter must be given even greater breadth than has been claimed for it; or

Secondly, that the second and third patents, one or the other, or both, must be considered as disclosing independent unrelated inventions, dealing with temperatures or sterilization upon a basis capable of legal differentiation from disclosure of the original in that respect.

This second alternative, so it seems to me, on its consideration involves again the question of a range of temperature in connection with a definition of sterilization. In taking the view that these two patents are subordinate, and are addressed to the art as it was expanded by Kraft's first patent, it may be added that, whichever view is taken, it does not follow that the defendant's infringement is coextensive with each of the three patents in each of their respective elements or claims. It must be held that defendant adopts Kraft's fundamental process for "sterilizing" (in *some* sense) a Cheddar cheese as covered by his first patent in suit, and makes the product therein recognized; that it follows precisely the second patent as it discloses the thought of remaking, blending Cheddar cheese—and *in some way* reforming it. It admits that it follows the second patent precisely with respect to heating and stirring to and at the specified temperature—though it does not re-form into Gouda or Edam "types"; and it admits that it follows precisely the "boxing" step of the third patent. If in this way infringement may be admitted, but asserted as permissible, because "piecemeal," and if each patent be insistently treated as narrow, and unrelated to a continuous development or expansion growing out of a fundamental disclosure, then the protection afforded by each, as well as all, of the patents goes for naught. Yet this is urged in a case where in fact an identical product, the result of quite identical processes, is made by the patentee and by alleged infringer.

Consideration should be given to another contention. The defendant offered, and, over plaintiff's objection, was permitted to introduce, another patent granted to Kraft, No. 1,350,870, August 24, 1920, Application therefor was filed October 18, 1919, the date upon which application for the reissue —the first patent in this suit—was filed. The latter was granted December 23, 1919. The argument is now made that this last patent, being copending with the application for reissue of Kraft's original patent No. 1,186,-524, may competently be resorted to, to limit the effect of, and, if necessary, entirely to overthrow, the reissue. In effect it is said that this last patent, because of its copendency with the application for reissue of No. 1,186,524, and in view of what is asserted (in this last patent) with respect to the original, estops the plaintiff from denying that the reissue was not a broadening of the original. The difficulty of according such probative force to a patent had led me to deal with the subject as involving the merit of plaintiff's objection to its reception in evidence.

For this purpose, it may be assumed that in patent 1,350,870, thus applied for and in fact granted (after the reissue), Kraft expressly reaffirms patent 1,186,524, contemporaneously submitted for reissue. He asserts that the original process has "proven very successful and gone into extended use," but that his present invention "effects certain economies in cost of treatment, shortens the term during which highly skilled supervision of the process is required, and tends to retain and preserve the more delicate flavors of the cheese." He reasserts the fundamental difficulty of sterilizing Cheddar cheese—i. e., the disintegration upon application of "the necessary sterilizing temperature"—but that he has now discovered "how to so treat the cheese as to raise its disintegration temperature point above the temperature required effectively to sterilize it, and to effect this result by a low temperature treatment; a temperature considerably below that at which effective sterilization can be secured."

He specifies as preliminary steps, comminuting the cheese, melting, stirring, as directed in all of the other patents. Directions are given to raise the temperature "to about 120° to 140° F.," after reaching which it is so regulated as to prevent rising higher. But such temperature is maintained until the cheese reaches what is termed "a stably homogenized condition." The heat and stirring treatment is then stopped. He characterizes such condition as "smooth and homogeneous throughout, and has a marked viscous consistency, so that it can be drawn out, while hot, into long attenuated strings, like taffy or very thick syrup." The necessary duration of the treatment is from 30 to 50 minutes to raise the temperature to the desired point, "and a further treatment of 10 to 15

minutes to bring it to a fully stably homogenized condition." He proceeds:

"At the conclusion of the homogenizing step, the cheese is in condition to withstand an indefinitely continued temperature of 212° F. or more, without disintegration or separating out of its butter fat, although it be subjected to such heat without stirring or agitation."

After saying that the cheese can be placed in cans, jars, or other containers, "capable of being hermetically sealed, and after being sealed is proceeded to effect sterilization," the patentee continues:

"To secure effective sterilization so as to insure permanent keeping qualities in the cheese under all climatic conditions, it must be brought to a temperature of about 175° F. and kept at or above that temperature for about 15 minutes, although a somewhat lower temperature, say 160° F., continued for a longer time, say 20 or 30 minutes, is usually sufficient to effectively sterilize."

In discussing the patents and Patent Office proceedings and the evidence in this case, counsel for the plaintiff said in substance that the efforts of the plaintiff and other workers in the art disclosed what might be called "groping" on this matter of temperature. If it be conceded, as we think it must, that it is not easy to reconcile all of the statements found on paper, it must likewise be conceded, as hereinbefore intimated, that upon the promptings of *something* (Kraft's original discovery, it is believed) the parties here have found a satisfactory temperature (within a not clearly definable range) at which to make a sterilized cheese. If, therefore, the defendant may have ground for saying that Kraft in this patent has reasserted a meaning and effect of and for his original patent which is repugnant to his reissue; that he is therefore estopped from claiming the benefits of the reissue—what shall be said if and when reliance is sought to be placed by Kraft upon this last patent? Suppose, instead of seeking to enforce the reissue in the present case, he were relying upon this other patent; could the reissue then be cited as estopping him from attempting to give to the original patent the recognition which he claims for it in the later? Such later patent being before the court as evidence—not in support of any contention of the plaintiff, but as defendant has sought to introduce it—the questions, (1) Shall the acceptance of the later estop him from enforcing the reissue? or (2) Shall the acceptance of the reissue estop him in an appropriate proceeding from enforcing the later?

seem to me to furnish the test of the competency of such later patent for any such purpose as the establishment of an estoppel.

Nor is this the whole difficulty. Merely pointing out that in this later patent Kraft makes assertions with respect to the earliest patent that are repugnant to the reissue cannot oblige the plaintiff to respond as though the later patent were before the court for enforcement. Such later patent might be asserted to contain a real advance over the original, as the defendant here claims the original should be interpreted, or that it contains such advance, *howsoever the original be interpreted.* Even if it be granted that the later and the reissue patent present repugnant views respecting the original, it does not follow that Kraft should be held to the "estimate" which, in the later, he places upon the earlier, patent, rather than to the tenability of his application for reissue. It is my judgment that the later patent is not competently before the court to establish the estoppel claimed.

[2] The general conclusions in the case are that the three patents in suit are valid and infringed, and that the plaintiff may have a decree accordingly.